## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**JEROME SCOTT,**

     **Plaintiff,**

**v.**                                                  **Civil Action No.: 1:18cv61**
                                                        **(Judge Kleeh)**

**UNITED STATES OF AMERICA,**

     **Defendant.**

### <u>REPORT AND RECOMMENDATION</u>

### I. <u>Introduction</u>

On March 23, 2018, the *pro se* Plaintiff, an inmate then-incarcerated at USP Atwater,[1] in Atwater, California, initiated this case by filing a complaint pursuant to the Federal Tort Claims Act ("FTCA"). ECF No. 1. Because the complaint was not on a form approved by this district, the Clerk of Court issued a deficiency notice. ECF No. 2. On April 2, 2018, Plaintiff moved for an extension of time in which to correct his deficient pleadings; by Order entered April 3, 2018, Plaintiff's motion was granted. ECF Nos. 5, 6. On April 6, 2018, Plaintiff filed his court-approved form complaint.  ECF No. 7.  Plaintiff also filed a motion for leave to proceed as a pauper with supporting documents; a motion for discovery and production; and an affidavit. ECF Nos. 8, 9, 10, 11, 12. By separate Orders entered April 9, 2018, Plaintiff's motion for discovery and production was denied without prejudice as premature, and he was granted permission to proceed as a pauper but directed to pay an initial partial filing fee ("IPFF").  ECF Nos. 13, 14. On April 13, 2018, Plaintiff moved for appointed counsel; by Order entered April 16, 2018, the motion for appointed counsel was denied.  ECF No. 15, 17. On April 27, 2018, Plaintiff filed a

---

[1] Plaintiff was released from prison on June 28, 2019, and is currently residing in New Orleans, Louisiana.

motion requesting that the Court direct the Trust Fund Officer at his prison to deduct the IPFF from his account. ECF No. 24. On May 15, 2018, Plaintiff moved to amend his complaint. ECF No. 24.  By Order entered May 16, 2018, Plaintiff's motion requesting that the court direct the Trust Fund Officer at his prison to pay the IPFF was granted and the Warden at the prison was directed to respond to Plaintiff's allegations regarding the same.  ECF No. 25.  By separate Order entered the same day, Plaintiff's motion to amend was denied as moot. ECF No. 26. On June 11, 2018, Plaintiff filed a motion requesting Rule 56(f) discovery and another motion for discovery and production. ECF Nos. 31, 32.  Plaintiff paid his IPFF on June 12, 2018. ECF No. 33.  On June 26, 2018, a letter from the Warden regarding Plaintiff's IPFF was docketed.  ECF No. 34. On July 3, 2018, Plaintiff again moved for appointed counsel and filed a request for admission. ECF Nos. 35, 36.  On August 20, 2018, Plaintiff moved for an entry of default. ECF No. 39.  By separate Orders entered August 21, 2018, Plaintiff's second motion for discovery and production and his motion requesting Rule 56(f) discovery were denied without prejudice as premature; his second motion for appointed counsel was denied; and his motion for entry of default and/or default judgment were denied. ECF Nos. 40, 41, 42.

On August 27, 2018, Plaintiff filed a document titled Default of Judgment. ECF No. 43. On November 14, 201, Plaintiff filed a Rule 37(a) Motion to Compel Disclosure or to Compel Discovery Federal Rule of Civil Procedure, and a document tiled "Rule #15 Amended and Supplement [sic] Pleadings Under Federal Rules of Civil Procedure."  ECF Nos. 49, 50. By Order entered November 15, 2018, the Defendant United States of America was directed to answer Plaintiff's FTCA claims.  ECF No. 51.  On November 26, 2018, Plaintiff filed motions to correct an error in the Order to Answer and to appoint counsel.   ECF Nos. 54, 55. By Miscellaneous Case Order entered November 30, 2018, this case was reassigned from Senior

District Judge Irene M. Keeley to District Judge Thomas S. Kleeh.  ECF No. 61. On December 3, 2018, Plaintiff filed a supplement to his motion to appoint counsel.  ECF No. 62.  On December 14, 2018, Plaintiff filed another motion to appoint counsel. ECF No. 63.  On December 26, 2018, the Government filed a motion to stay the case due to the lapse in appropriations. ECF No. 65.  By Order entered January 3, 2019, the motion to stay was granted. ECF No. 66.  By Order entered February 5, 2019, the stay was lifted. ECF No. 69.  On February 21, 2019, the Government filed a motion for an extension of time. ECF No. 72. By Order entered February 26, 2019, the extension was granted. ECF No. 73.   On March 5, 2019, Plaintiff objected to Defendant's motion for the extension. ECF No. 74.

On April 3, 2019, the Government filed a motion to dismiss or in the alternative, motion for summary judgment with a memorandum in support. ECF Nos. 77, 78. On April 8, 2019, Plaintiff filed a motion for default judgment.  ECF No. 79. By separate Orders entered April 8, 2019, Plaintiff's motion to correct was granted; his motion to compel discovery was construed as a motion to serve complaint and denied as moot; Plaintiff's Requests for Admissions were stricken from the record as premature and discovery was stayed; Plaintiff's second motion for entry of default and/or default judgment was denied; Plaintiff's third and fourth motions for appointed counsel were denied; and because Plaintiff was proceeding *pro se*, a <u>Roseboro</u> Notice was entered, advising him of his right to respond to the Government's dispositive motion. ECF Nos. 79, 81, 82, 83, 84, 85, 86.

On April 10, 2019, the Government filed a response in opposition to Plaintiff's motion for default judgment. ECF No. 87. On April 22, 2019, Plaintiff filed a response in opposition to the Government's dispositive motion. ECF No. 89. On May 6, 2019, the Government filed a reply to Plaintiff's response in opposition to its dispositive motion.  ECF No. 92. On May 17,

2019, Plaintiff filed a "Response to Defendant['s] Reply Memoranda, See Exhibit." ECF No. 94. On July 5, 2019, July 8, 2019, and again on October 15, 2019, Plaintiff filed Notices of Change of Address.  ECF Nos. 95, 96, 99.

This matter is before the undersigned for review, report and recommendation pursuant to LR PL P 2, *et seq*., and 28 U.S.C. § 636(b)(1)(B).

## II. <u>Factual Background</u>

Plaintiff was committed to BOP custody on August 5, 2008. Declaration of Tiffanie Little, Legal Assistant, BOP Mid-Atlantic Regional Office ("Little Decl."), ECF No. 78-1, ¶ 5. He was incarcerated at USP Hazelton from March 28, 2017 until September 7, 2017. <u>Id.</u>

On May 24, 2017, Plaintiff was found in possession of a prison-made weapon and non-hazardous tool; accordingly, he was placed on "dry cell" status, on the reasonable belief that he might still be in possession of contraband after a visual search.[2] <u>See</u> Declaration of Jamie Canfield, Lieutenant, Special Investigative Services ("SIS"), Federal Correctional Complex ("FCC") Hazelton ("Canfield Decl."), ECF No. 78-2, ¶ 8 at 2 - 3.

There appears to be no dispute that on May 28, 2017 at USP Hazelton, the Plaintiff was involved in a use of force with BOP staff during which O.C. (oleoresin capsicum "pepper spray") was deployed; the Plaintiff does not specify what time this occurred; Defendant contends it occurred at approximately 2:00 p.m. <u>See</u> Canfield Decl., ¶¶ 7 at 2 – 10 at 2 -3. More specifically, at around 2:00 p.m. on May 28, 2017, after the "dry cell" process recovered no contraband [<u>id.</u>, ¶ 8 at 3] USP Hazelton compound staff called for the Operations Lieutenant to come to Receiving and Discharge ("R&D"). <u>See</u> Canfield Decl., ECF No. 78-2, ¶ 7 at 2. In accordance with policy, after being taken off "dry cell" status, Plaintiff was to be visually

---

[2] "Dry cell" status is when an inmate is placed in a cell which has been searched and deemed clean of contraband by staff, for observation; the inmate's bowel eliminations are monitored for the passage of possible contraband from the inmate's body. <u>See</u> Canfield Decl., ECF No. 78-2, ¶ 8 at 3.

searched and body scanned prior to being escorted to the Special Housing Unit ("SHU"). Id. at ¶ 7. Defendant contends that during the visual search, Plaintiff "came off of the wall in an aggressive manner" toward the officers conducting the search, showing signs of imminent violence against staff. Canfield Decl. at ¶ 9. As a result, one of the officers dispensed one (1) two-second burst of O.C. spray. Id. Following the use of O.C. spray, staff employed immediate use of force, placing Plaintiff on the ground to control his aggressive and disruptive behavior. Id. After regaining control of Plaintiff, staff placed him in hand restraints. Id. Once Plaintiff was placed in hand restraints, he was escorted to the SHU, where he was decontaminated, medically assessed, photographed, issued new clothing and placed in hard ambulatory restraints. Id. Plaintiff was placed in the SHU without further incident. Id. at ¶ 10.

After Plaintiff was decontaminated in R&D and taken to the SHU, he was decontaminated again. See Declaration of Gretchen Ryle, Nurse Practitioner ("N.P."), Health Services Administrator, BOP Mid-Atlantic Region ("Ryle Decl."), ECF No. 78-3, ¶ 8 at 2. At 2:26 p.m. on May 28, 2017, Plaintiff "received a full evaluation by medical staff." Id. The only injuries medical staff observed were "[s]uperficial abrasions" on Plaintiff's upper back and right knee, and Plaintiff did not report any additional injuries to staff during the evaluation when questioned. Id. at ¶ 9. After the examination, Plaintiff was placed in ambulatory restraints which were checked by medical staff and determined to be appropriately applied. Id. at ¶ 10.

A Special Investigative Services ("SIS") investigation confirmed that Plaintiff had been "non-compliant during the visual search, became agitated, and attempted to assault a staff member." Canfield Decl., ECF No. 78-2, ¶ 10 at 3. The SIS investigation further concluded that the "immediate use of force by staff was justified and appropriate to maintain control of the situation." Id. No video surveillance of the incident exists, because "footage not needed for

recording near the time of event. Footage becomes automatically purged [if] it is not saved to disc or video archive." Id., ¶ 12 at 3.

On July 22, 2017, Plaintiff filed an administrative tort claim with the BOP requesting monetary compensation in the amount of $3,000,000.00 for the injuries he contends he sustained during the March [sic – May] 28, 2017 incident at USP Hazelton. Little Decl., ECF No. 78-1, ¶ 7 at 2. Specifically, Plaintiff alleged that during a visual strip search, a BOP officer used racist and "unprofessional" language, sprayed him with O.C. Spray, used excessive force against him, beat him, and digitally penetrated his "anal." Id. The BOP received Plaintiff's Standard Form ("S.F.") 95 on August 8 [sic][3], 2017. Id. After receiving Plaintiff's administrative tort claim and investigating its allegations, the BOP found that Plaintiff had suffered no compensable personal injury due to the any BOP employee's negligence. Id. ¶ 8 at 3. On May 14 [sic - June 15], 2018, the BOP denied Plaintiff's claim.  Id.

### III. The Pleadings

#### A. The Complaint

Plaintiff's complaint ostensibly raises two claims: deliberate indifference and intentional infliction of emotional distress ("IIED"). ECF No. 7 at 6. However, Plaintiff's claim of deliberate indifference appears to also state claims of negligence, excessive force, sexual assault, and deliberate indifference to serious medical needs and/or medical negligence. Id.; see also ECF No. 7-1 at 1 – 2.  More specifically, Plaintiff alleges that on May 24, 2017, while incarcerated at USP Hazelton, he was placed into a Health Services observation room where he was subjected to a visual strip search and then issued paper clothing. ECF No. 7-1 at 1. He was placed under

---

[3] The copy of Plaintiff's S.F.95 Administrative Tort Claim was stamped as "received" by the BOP on August 2, 2017. See ECF No. 78-1 at 14.

constant supervision by federal correctional officers until he could produce three bowel movements "in front of the lieutenant" into a clear trash bag provided for that purpose. Id.

Plaintiff alleges that after four days, on May 28, 2017, once he had produced the requisite three specimens, and the examination of the same revealed no contraband or anything else improper, he was cleared to be removed from the "Health Service observation room." Id. at 1. He alleges that in violation of his Eighth and Fourteenth Amendment rights, and "by the orders of the Captain or the Lieutenant," Officers J. Brady ("Brady"), Officer Sander ("Sander"), and Officer Hanovich ("Hanovich") "took it upon themselves" to take him to "R&D . . . [an] isolated area on the weeken[d]" "with malicious and sadistic intent" to strip search him. Id. Plaintiff contends that he cooperated with another visual search, but then Brady cursed at him, using a racial epithet, and made him bend over, bare his bottom, and spread his buttocks for a search. Brady then sprayed him twice in the face and eyes with O.C. spray before ordering Sander and Hanovich to take Plaintiff to the floor using excessive force. Id. at 1 – 2. Plaintiff alleges that these officers punched and kicked him while Brady held him in a "head lock" with one hand while hitting him with his other hand in the ribs and side. Id. Brady then directed Sander and Hanovich to put their finger in Plaintiff's anus and one of them did so, but Plaintiff was unable to see which officer did it. Id. at 2. He alleges that Brady threatened him, telling him that if he ever told what had happened, that he would "make his life a living hell." Id. Accordingly, he contends that when Lieutenant Smith asked him if one of the officers had sexually assaulted him, he was afraid "for his life" and denied that they had done so. Id.

Thereafter, Plaintiff contends that he was "refused proper medical treatment" and not taken to Health Services for an exam before being placed into ambulatory restraints. Id. He contends that Lt. Smith ordered that photos be taken of Plaintiff's injuries; and that a review of

surveillance video camera footage, hard camera, and photos at USP Hazelton will support his claims. Id.

Plaintiff avers that he filed an Administrative Tort Claim SF-95 on September 22, 2017 [sic] [see ECF No. 7 at 4],[4] and received an acknowledgement on August 7, 2017. ECF No. 7 at 4. His claim was assigned the number TRT-MXR-2017-06091. Id. at 5.

Plaintiff describes his injuries from the event as physical, mental, and emotional pain, psychological disorders, nightmares, permanent injuries including broken ribs, damaged knees, strain and pain in the lower back, anal injury, and cuts and bruises to his arms. ECF No. 7 at 9.

As relief, he seeks $3,000,000.00 in damages. Id.

**B. Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment**

In support of its dispositive motion, Defendant contends that the complaint should be dismissed or summary judgment granted in its favor because:

1) even liberally construing Plaintiff's "deliberate indifference" claim as a negligence claim, Plaintiff's claim must fail because he cannot prove negligence on the part of the Defendant;

2) Plaintiff has not adequately pled, nor can he establish a cognizable intentional infliction of emotional distress claim.

3) To the extent that Plaintiff seeks to make constitutional claims in this action, the same should be dismissed pursuant to 28 U.S.C. § 2680, because Plaintiff cannot bring constitutional claims under the FTCA because the United States has not expressly waived its sovereign immunity for such claims in the FTCA. See ECF No. 78 at 6 – 12.

4) Moreover, the Defendant contends that the "record blatantly contradicts Plaintiff's allegations." Id. at 12.

---

[4] Plaintiff did not attach copies of his Administrative Tort Claim acknowledgment letter or his Administrative Tort Claim denial letter to his complaint. However, the United States has provided a copy of Plaintiff's Administrative Tort Claim and its denial letter (but not a copy of the claim acknowledgement letter), attached as exhibits to its memorandum in support of its dispositive motion. Plaintiff's Administrative Tort Claim was filed on July 22, 2017, not September 22, 2017 as Plaintiff's complaint states. See ECF No. 78-1 at 14. Plaintiff's Administrative Tort Claim denial letter was dated June 15, 2018, ten months and 8 days after the date that Plaintiff states he received the acknowledgment letter.

In support of its arguments, Defendant attaches three sworn declarations with exhibits, copies of Plaintiff's Administrative Tort S.F. 95, a copy of his June 15, 2018 denial letter,  and a copy of an excerpt from Plaintiff's BOP medical records, showing that Plaintiff was examined in Health Services at 2:26 p.m. on May 28, 2017. See ECF Nos. 78-1, 78-2, 78-3.

## C. **Plaintiff's Response in Opposition**

Plaintiff repeats his factual claims, reiterates his arguments, and attempts to refute the Defendant's on the same.  He argues that he is entitled to bring Eighth Amendment claims for the deprivations of his constitutional rights he suffered, and that "routine anal and testicular searches, carried out in an abusive manner" violate the Eighth Amendment. ECF No. 89-1 at 7 - 9. He denies having attacked the Bureau of Prisons ("BOP") staff; alleges that they falsified records; denies that he was found with a homemade weapon; and argues that "verbal abuse and other factors" can support a claim of "objectively unreasonable force." Id. at 10. He argues that BOP policy requires that the defendant prepare an incident report and secure videotape evidence of incidents of use of force and application of restraints, arguing that the Defendant has not provided any evidence and has falsified documents. Id. at 11 – 12.  Plaintiff attaches a sworn affidavit, attesting to his claims. ECF No. 89-2.

## D. **Defendant's Reply**

Defendant notes that Plaintiff's response is merely the same factual representations and claims he made in his original complaint; thus, it renews its facts and argument previously asserted in support of its dispositive motion.  ECF No. 92 at 1. Further, Defendant notes that "for the first time and without basis," Plaintiff raises a claim that USP Hazelton staff "falsified" evidence, medical records, and documents.  Id. at 1 – 2.  Defendant notes that Plaintiff continues to assert constitutional and civil rights violations in a FTCA, where they are not permitted. Id. at

2. Defendant denies that it violated any BOP policy regarding preservation of video evidence, pointing out that the sworn declaration of Jamie Canfield averred that no video surveillance of the incident exists, because none was needed at the time of the event. Id. Moreover, it notes that even if Plaintiff's allegations of violations of BOP policy were true, they are not properly raised in a FTCA action and should be dismissed. Id. at 3.

### E. Plaintiff's Response

Plaintiff filed an additional response, or surreply, to Defendant's reply. However, under the local rules of this District, a surreply may not be filed and will not be considered by the undersigned. LR PL 11(d).

## IV. Standard of Review

### A. Motion to Dismiss Rule 12(b)(1)

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(1), no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. See Materson v. Stokes, 166 F.R.D. 368, 371 (E.D. Va. 1996). Instead, the burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the party asserting federal jurisdiction. A trial court may consider evidence by affidavit, deposition, or live testimony without converting the proceeding to one for summary judgment. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982); Mims v. Kemp, 516 F.2d 21 (4th Cir. 1975). Because the court's very power to hear the case is at issue in a Rule 12(b)(1) motion, the trial court is free to weigh the evidence to determine the existence of its jurisdiction. Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. See Fed.R.Civ.P. 12(h)(3).

**B. <u>Motion to Dismiss Rule 12(b)(6)</u>**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . ." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Id.</u>

To survive a motion to dismiss, a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. <u>Id.</u>; <u>see also</u> <u>Nemet Chevrolet, Ltd. v. Comsumeraffairs.com</u>, <u>Inc.</u>, 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." <u>Id.</u>

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. <u>See</u> Fed.R.Civ. P 8 (providing general rules of pleading), Fed.R.Civ. P. 9 (providing rules for pleading special matters),

Fed.R.Civ. P. 10 (specifying pleading form), Fed.R.Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed.R.Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted.) Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

Scott is representing himself, which requires the Court to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251(1976); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)(per curiam); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). A court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993).  Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

**C. Motion for Summary Judgment**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u>, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita</u>, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  <u>Id.</u> This means that the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' <u>Anderson</u>, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, 475 U.S. at 587.

## V. <u>Analysis</u>

### A. <u>Timeliness of Plaintiff's Claims</u>

On July 22, 2017, the Plaintiff filed an administrative tort claim seeking $3,000,000.00 for personal injury. ECF No. 78-1 at 14. The claim was received by the BOP's Mid-Atlantic Regional Office on August 2, 2017.[5] ECF No. 78-1 at 14. Plaintiff states, without providing a copy of the same, that he received a claim acknowledgment letter on August 7, 2017 [ECF No. 7 at 4 – 5]; Defendant's response makes no reference to when the claim was acknowledged. The Plaintiff's claim was denied by letter dated June 15, 2018 [<u>id.</u> at 20]; by that time, the Plaintiff

---

[5] The Declaration of Tiffanie Little ("Little"), Legal Assistant at the BOP's Mid-Atlantic Regional Office, attached to the Defendant's memorandum in support of its dispositive motion, misstates the date on which the BOP's Mid-Atlantic Regional Office received Plaintiff's administrative tort claim as August 8, 2017 [ECF No. 78-1, ¶ 7 at 2]; however, the attached copy of the Administrative Tort Claim is clearly stamped as having been received on August 2, 2017. <u>See</u> <u>id.</u> at 14. Further, after first correctly stating that the BOP denied the claim on June 15, 208, Little erroneously references attaching a "true and correct copy of the May 14, 2018 Tort Claim Denial Letter." <u>Id.</u>, ¶ 8 at 3.

had already filed this FTCA on March 23, 2018, eight months and one day after the date the claim was filed.

The FTCA contains an exhaustion requirement, which requires a potential claimant to present his claim to the appropriate Federal agency within two years of when it accrues. 28 U.S.C. § 2401(b). Generally, a lawsuit may not be filed in federal court until the agency denies the claim in writing. 28 U.S.C. § 2675(a). Once the denial letter is sent, a claimant must commence a lawsuit within six months. Id. § 2401(b). There is, however, an exception to the rule that a claimant must wait for a final denial letter: "**The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant at any time thereafter, be deemed a final denial** of the claim for purposes of this section." 28 U.S.C. § 2675(a) (emphasis added).  Because Plaintiff did not receive a "proper final agency denial within 6 months of the claim as required by 28 U.S.C. § 2675, the plaintiff has the right at any time of his own option to deem such a failure to be a final agency denial." Boyd v. United States, 482 F.Supp. 1126, 1129 (W.D. Pa. 1980), citing Mack v. United States Postal Service, 414 F.Supp. 504 (E.D. Mich. 1976). Accordingly, this claim is not barred by the § 2401(b) statute of limitations and this Court has subject matter jurisdiction over the claims raised therein.

## B. Plaintiff's FTCA Claims

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of the negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the Government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) and 2671-2680. An

inmate "can sue under the FTCA to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150 (1963). The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

However, the FTCA does not create a new cause of action. Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). "The statute merely permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Id.

Scott brings claims of deliberate indifference and IIED. Under the liberal construction of pleadings courts are to give *pro se* litigators, this Court agrees with the Government that the deliberate indifference claim should be analyzed as a negligence claim. "Deliberate indifference" claims are constitutional claims and would not be allowed under the FTCA.[6] The undersigned finds it proper to construe Plaintiff's deliberate indifference claim as negligence because Scott alleges that the Government owed him a duty to protect him, and that this breach resulted in injuries.

## A. **Negligence**

---

[6] Claims regarding conditions of confinement, excessive force, and deliberate indifference to serious medical needs, in violation of Eighth Amendment rights to be free of cruel and unusual punishment, or other constitutional claims are not actionable against the United States in a FTCA 28 USC §2671 *et seq.* action. A constitutional tort is not cognizable under the FTCA. Royster v. United States, 2008 U.S. Dist. LEXIS 106634 *13 (W.D. Pa. December 1, 2008). Accordingly, despite Plaintiff's claims to the contrary, any constitutional claims must be dismissed for failure to state a claim upon which relief can be granted.

Plaintiff contends that Defendant was deliberately indifferent because it had a duty to protect and care for him, and it breached that duty, resulting in "serious injury." ECF No. 7. More specifically, Plaintiff contends that the three BOP officers had "malicious and sadistic intent to strip search him" so they took him to R&D to do that, because it was an "isolated area on the weekend." ECF No. 7-1 at 1. He avers that once there, he was subjected to racist remarks was directed to bend over, spread his buttocks for a visual search; and was then sprayed with O.C. spray in the face, and then placed on the ground by use of "excessive force," put in a "head lock" and beaten. However, as noted *supra*, Defendant's version of the event is very different; it indicates that Plaintiff became aggressive toward staff when they approached to perform the required visual search after his "dry cell" stay was completed, and only then was O.C. spray used (once) before Plaintiff was quickly subdued and restrained by officers, then taken to be decontaminated and medically checked. The Government contends that Plaintiff cannot prove any breach of duty, nor has he alleged any evidence, other than mere assertions of damages.

In order to maintain a case against the United States under the FTCA, the plaintiff must demonstrate that his action is permissible under the FTCA and satisfies the necessary elements of a tort claim cognizable under law of the state in which the action accrued. In West Virginia, the plaintiff must establish three elements in a negligence suit: (1) a duty that the defendant owes to the plaintiff, (2) a negligent breach of that duty, and (3) injuries received as a proximate result from that breach. Webb v. Brown & Williamson Tobacco Co., 121 W.Va. 115, 2 S.E.2d 898, 899 (1939). The plaintiff must prove these elements by a preponderance of the evidence. Id. at 899. Pursuant to the FTCA, the BOP owes prisoners a duty of care that specifically requires the BOP to provide for the safekeeping, care, subsistence, and protection of all prisoners. See 18 U.S.C. § 4042; Muniz, 374 U.S. 150 (1963). Under West Virginia law, the duty of care that the

BOP owes to inmates is one of reasonable care. See McNeal v. United States, 979 F.Supp. 431 (N.D. W.Va. 1997).

Here, the undersigned finds that Plaintiff provides only a portion of the events, does not explain how and why he came to be "dry celled" in the first place, and never mentions that he attempted to assault BOP staff, leading to the use of force. First, despite Plaintiff's claim to the contrary, the use of force was justifiable, given that Plaintiff attempted to assault staff when approached for the visual search.  Second, Defendant did not breach any duty it had to keep Plaintiff safe by using force.  Further, once Plaintiff was subdued, he was immediately taken to be decontaminated, and was apparently decontaminated twice, before being taken to Health Services for evaluation, indicating the Government's attempts to prevent injury to him, not cause further injury.

Finally, Plaintiff's claims of injuries lack any support in the record.  On May 28, 2017, Plaintiff was seen by Chad Fowler, RN in Health Services at 2:26 p.m., after being decontaminated twice.[7] ECF No. 78-3 at 5. Plaintiff's medical records indicate that he appeared anxious, but was alert and oriented to time, place, and person. Id. at 4. His pulse was 130; respirations were 18; and his blood pressure was 140/90. Id. His neurological exam revealed a Glasgow Coma Scale score of 15.[8] Id. at 5. His eyes showed diffuse redness and had watery discharge. Id. His pulmonary, cardiovascular, and all other system examinations were within

---

[7] The Defendant's production of this copy of his medical record was apparently Plaintiff's impetus for his new (and likewise unsupported) claim, in his response, that the Government "falsified" records, because it completely refutes his claim that he was "never taken to medical" after the incident.

[8] The Glasgow Coma Scale (GCS) is a tool used by healthcare professionals to consistently evaluate the consciousness level of a patient. It is commonly used in the context of head trauma, but it is also useful in a wide variety of other non-trauma related settings. By regularly assessing a patient's GCS, a downward trend in consciousness level can be recognized early, allowing time for appropriate interventions to be performed. There are three aspects of behavior that are independently measured as part of an assessment of a patient's GCS – motor responsiveness, verbal performance and eye-opening.  The highest response from each category elicited by the healthcare professional is scored on the chart. **The highest possible score is 15 (fully conscious)** and the lowest possible score is 3 (coma or dead). See Glasgow Coma Scale (GCS), *available at:* < https://geekymedics.com/glasgow-coma-scale-gcs/ > (emphasis added).

normal limits. Id. He had no respiratory distress and his breath sounds were equal and clear bilaterally. Id. A "head to toe" assessment was conducted, and the only injuries noted were superficial abrasions to his upper back and right knee. Id. He denied any other injuries when questioned. Id. Plaintiff was advised to follow-up with sick call as needed. Id.

There is no support in the record for Plaintiff's claim of "permanent injuries." When evaluated by medical staff, Plaintiff reported no "broken ribs," rib pain, nor any difficulty breathing that would have accompanied the same; his respirations were 18, a normal rate, and he did not appear to be in respiratory distress, as would one with fresh rib fractures would.  He reported no strain or pain in his lower back, nor any knee damage, let alone any digital penetration. No cuts and bruises were seen. Further, a review of Plaintiff's previous filings indicates that Plaintiff has made unsubstantiated claims of rape before.[9]

Moreover, a comparison of the injuries Plaintiff reported in his S.F. 95 Administrative Tort claim (left and right knee, lower back, neck, right ribs, and injury to his "anal" ECF No. 78-1 at 14) with those in his complaint (physical pain, mental/emotion suffering, broken ribs, damage to knees, strain and pain to lower back; "anal," permanent injuries, psychological disorders, nightmares," cuts, bruises, arms." ECF No. 7 at 9), and those in his response in opposition to the Government's dispositive motion (cuts, bruises, swollen back, broken ribs, knee damage, "arms and Anal" ECF No. 89-1 at 5) indicates that the description of the same varies.

---

[9] On May 29, 2018, approximately two months after filing this case, Plaintiff filed another FTCA case alleging negligence and IIED, arising out of an April 1, 2017 incident (that occurred approximately two months before the May 28, 2017 incident at issue here), BOP officers unlocked his cell door to permit another inmate to enter and sexually assault him. See Scott v. United States, Case No. 2:18cv55. That case was dismissed on July 15, 2019. ECF No. 79.  The dismissal order noted that Plaintiff's claims about the alleged anal penetration he had experienced "changed multiple times," and that he alleged that his "anus suffered permanent damage" in that case, too. The Court concluded that Plaintiff's claims were "mere assertions with no evidence to back them up" and granted summary judgment for the United States. Id. at 9.

Attached to Plaintiff's response in opposition is a document titled "Sick Calls that I have submitted."  It appears to be a diary of sorts, with entries ostensibly dating from February 29, 2018 through May 29, 2018, where he recorded attempts to obtain medical care, his feelings about the alleged assault, and general allegations of further denials of medical care and requests for MRI(s) and pain medication. See ECF No. 89-3 at 2 – 5.  However, the undersigned notes that Plaintiff has not produced *any actual copies* of medical records, requests for sick call, "cop-outs" he allegedly submitted, requesting copies of his medical records, nor any copies of his alleged requests for medical treatment, only this self-created hand-written three-month diary, alleging that he did so.

Moreover, the undersigned finds it noteworthy that despite Plaintiff's claim in his complaint that he was so afraid "for his life" that he did not dare report the assault, it is apparent from the record that Plaintiff *did* report it, less than two months later, on July 22, 2017, while still at USP Hazelton, where the allegedly abusive BOP employees worked, which suggests that Plaintiff was not "afraid" for his life at all. He received the Administrative Claim acknowledgement letter on August 7, 2017, and was transferred from Hazelton a month later, on September 7, 2017.

Further, the undersigned notes that Plaintiff's "diary" listing of alleged attempts to obtain medical care began on February 29, 2018, three months *before* he filed this case, and nine months after the May 28, 2017 incident.  By implication, Plaintiff has produced nothing, not even a bare allegation, to indicate that he ever sought or received further medical care for his allegedly serious injuries, for a *full nine months* after he contends he sustained them.  Moreover, the "diary" ends on May 29, 2018, the same day his complaint was filed, yet nowhere in his complaint does he make any mention whatsoever of all of his alleged attempts to obtain

treatment for these alleged injuries, or the subsequent denial(s) of medical treatment for the same. The only denial of medical care mentioned in the complaint is a denial of medical care the day of the incident.

Here, while the undersigned recognizes that although Plaintiff's complaint was signed under penalty of perjury, the Defendant has produced sworn declarations from three BOP personnel, all attesting to its version of the facts, all of which completely contradict Plaintiff's story.  There is nothing in the record beyond Plaintiff's own assertions to support his version of the events. Plaintiff's allegations of permanent injury have no support; he has produced no medical record, no receipt to show he paid for any medical visit, nor any copy of anything to support his claims in the "diary" that he ever sought and was denied medical treatment later, and no proof, beyond further unsupported allegations, to prove that he ever sought or received medical attention for the alleged injuries.  Plaintiff has provided no evidence, nothing beyond bald assertions and conclusory statements about the BOP breaching its duty of care and the extent of his injuries. On the other hand, there are facts in the record that blatantly contradict what Scott has claimed. Scott's claim of a breach of duty must therefore fail. See Scott v. Harris, 550 U.S.372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

Thus, because Plaintiff has not produced any evidence of a breach of duty on the part of the Government, or any evidence of damages, beyond his own assertions, which are contradicted by the record, his negligence claim cannot survive summary judgment, and judgment on the same should be for the Defendant.

**B. Intentional Infliction of Emotional Distress**

The FTCA waiver of sovereign immunity is subject to several requirements and limitations. One of those is found in 28 U.S.C. § 1346(b)(2), which provides as follows:

> No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injuries suffered while in custody without a prior showing of physical injury.

Similarly, § 803(d) of the   Prison Litigation Reform Act, codified at 42 U.S.C.§ 1997(e)(2), also predicates a prisoner's claim for mental or emotional injuries suffered while in custody on a showing of an accompanying physical injury. See 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injuries suffered while in custody without a prior showing of physical injury.").

As previously noted, Scott has not provided any evidence that a sexual act was committed or that he suffered any physical injuries as a result of the Government's negligence. As a threshold matter, his claims cannot proceed under the FTCA.

Even if his claims could proceed, he has not provided evidence that his IIED claim could survive summary judgment. To prevail on an intentional infliction of emotional distress claim, plaintiffs must prove:

> that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Travis v. Alcon  Labs., Inc., 202 W.Va. 369, 375, 504 S.E.2d 419, 425 (1998).   The burden on the plaintiff to prevail on an IIED claim is extremely high. See Pegg v. Herrnberger, 845 F.3d 112, 122 (4th Cir.2017) ("It Is difficult to overstate the high burden of proof required to sustain

a tort claim for intentional infliction of emotional distress/outrage. "); <u>Keyes v. Keyes</u>, 182 W .Va. 802, 805, 392 S.E.2d 693, 696 (1990); <u>Wolfer v. Mountain Top Hunting Club, Inc.</u>, 2015 WL 7628704, at *5 (W.Va. Nov. 20, 2015). Mere negligence cannot constitute outrageous conduct. <u>See Courtney v. Courtney</u>, 186 W.Va. 597, 602, 413 S.E.2d 418,423 (1991) ("Thus, conduct that is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent does not constitute outrageous conduct.").

Scott's evidence of IIED is the same set of mere assertions with no evidence to back them up that have been discussed above in the negligence claim. The lack of evidence combined with the extremely high burden for a plaintiff to sustain an IIED claim gives the undersigned no alternative; summary judgment on the IIED claim should be granted.

## C. **Medical Negligence**

In his complaint, Plaintiff states that after the use of force incident and the digital penetration of his anus on May 28, 2017, he was "then refused proper medical treatment before he was placed in ambulatory restraints and they never took . . . [him] to Medical Health Services for an exam" even though he had visible injuries. ECF No. 7-1 at 2.  In his S.F. 95, Plaintiff contends that he was refused a medical exam before being placed in restraints and "they never took me to medical!" ECF No. 78-1 at 17.

As noted *supra*, Plaintiff alleges that he sustained "permanent injuries," broken ribs, damaged knees, strain and pain to his lower back, and an unspecified injury to his "anal." ECF No. 7 at 9. As previously mentioned, Defendants produce a copy of the record of the medical exam performed on Plaintiff shortly after he was decontaminated from the OC spray on May 28, 2017; in it, Plaintiff was noted to have superficial abrasions on his upper back and right knee,

and that he had no other injuries "visualized or verbalized," and specifically denied any other injuries when questioned. See ECF No. 78-3 at 4 – 6.

To the extent that Plaintiff may be seeking to establish a medical negligence claim, he must comply with West Virginia law and establish that:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code § 55-7B-6. This section provides in pertinent part:

> **§ 55-7B-6**. Prerequisites for filing an action against a health care provider; procedures; sanctions.
>
> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.
>
> (b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how

the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the Rules of Civil Procedure.

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp. 2d 805, 806-807 (N.D. W.Va. 2004).

With regard to the appropriate standard of care, Plaintiff has not sustained his burden of proof. Plaintiff does not assert, much less establish, the standard of care for any of his alleged injuries from the May 28, 2017 incident. Further, this is not a case of alleged malpractice so obvious that it entitles Plaintiff to the common knowledge exception of W.Va. Code § 55-7B-6(c). Thus, any possible claims as to medical negligence must be dismissed.

## VI. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [ECF No. 77] be **GRANTED,** and Plaintiff's FTCA complaint [ECF No. 7] be **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a claim upon which relief can be granted.

**Within fourteen (14) days** after being served with a copy of this Recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the Recommendation to which the objections are made. Objections shall identify each portion of the magistrate judge's recommended disposition that is being challenged and shall specify the basis for each objection.   Objections shall not exceed ten (10) typewritten pages or twenty (20)

handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12. A copy of such objections should also be submitted to the United States District Judge.

**Failure to timely file objections as set forth above will result in waiver of the right to *de novo* review by this Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Petitioner by certified mail, return receipt requested, to his last known address as reflected on the docket sheet, and to transmit a copy electronically to all counsel of record.

This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the Magistrate Judge's association with this case.

DATED: January 22, 2020

/s/ *Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE